City of Shreveport City of Shreveport All right, Ms. Buckle, we're ready for you. May it please the Court. Good morning, Your Honors. I'm Nicole Buckle. I'm here on behalf of the appellants, the City of Shreveport and Corporal John Persino. Judge Stewart, you mentioned in the previous case that this Court is very experienced in their expertise to work at complex cases. Your Honors, I would respectfully submit that this should not be a complex case. Based on the facts and the well-established jurisprudence on qualified immunity, we respectfully submit that this is the... Are you surmising that qualified immunity is not complex? Based on the facts of this case, Your Honor, and the... But that's what everybody tells us in every qualified immunity case. They say it's not complex. It's straightforward. Your Honor, I think when you look at the rulings... I know you're saying in this case it isn't. I'm just saying we get a bucket load of qualified immunity cases and they are really thorny. No, I agree that qualified immunity itself is very complex. That was not my intention. I understand. You just wanted me to know that you were listening to my little commentary. That was purely gratuitous. I got it. I got it. I got it. This case involves less than eight seconds. And when you break it down from when Corporal Persino began opening his car door... Let's cut to the chase. Yes, Your Honor. I didn't mean that literally, but we know what the case is about. There's at least another pool case or whatever that's been around for a while. But in this case, we have video. Yes. A lot of cases we get, we either don't have video or it's garbled or you can't see or whatever. I mean, these cases just vary. So the video isn't always helpful. And so we do have case law that says when there is a video, you know, that looms large in terms of, you know, black deals and so on and so forth. So given that we have the video and so forth, so go forward. I mean, we know the background facts, you know, in terms of the stopping like that. But cutting in on why Judge Walter erred given our case law in this instance to say that the officers were not entitled to qualify. Yes, Your Honor. So the district court, Judge Walter's opinion was really based on what three fact issues that he found. The first was he found that there was an issue as to whether Corporal Persino gave verbal warnings prior to shooting. And the second and third are sort of the same, but his ruling was whether the video provided clarity to whether Corporal Persino could see Mr. Poole's hands the time he shot. The first fact issue that he found, respectfully, is not material. It is this court and the Supreme Court have said under Tennessee v. Garner, a warning is required only when it's feasible. And I'll go back to what I was saying a minute ago. When you look at from the moment Corporal Persino began opening his car door, it is less than four and a half seconds before the shot is fired. That's not feasible. Not when Corporal Persino is pushing open his car door in such a rapid movement that he fails to even place his vehicle in park, is exiting the vehicle, rushing to his left side to get out of what he believes will be the line of fire, drawing his weapon, attempting to get in a firing stance, making the decision to fire, reacting, and firing his weapon. In less than four and a half seconds. Let's go to the second fact dispute he found, which I'm looking at the opinion right here, page 12. Fact dispute as to whether Persino could see that Poole's hands were empty when he opened fire. I mean, isn't that absolutely material? If he's shooting at someone he knows isn't armed? I do believe that issue is material, Your Honor. However, I don't believe, I believe the district court was wrong in looking at the video for clarity. And what I mean by that is both— But you can't—our limited interlocutory jurisdiction, we can't review whether the district court was correct or not in finding a fact dispute, right? We can just review whether it's material. So we have to accept that the existence of these fact disputes at this stage of the case. But I don't believe that whether there was clarity presented by four and a half seconds of video is material. I believe by doing that you are second-guessing the officer and you're looking at it in hindsight. And I would refer the court to— But again, he says there's a fact issue, that a jury could decide that Persino was firing at someone he knew didn't have a gun in his hand or anything else in his hand. How can we—explain to me jurisdictionally how we can say, how we can review, say he was right or wrong, say that's right or wrong that there's a fact issue. Don't we have to accept that and then decide whether that would materially matter for an excessive force analysis? I think it's the weight that's given to that dispute when you look at how rapidly these events were unfolding. And if you'll allow me— Well, do you agree—if Persino shot at someone whose hands he knew were empty, do you agree with me there that that would be excessive force? If he knew they were empty, but I don't believe that was— Well, if he saw they were empty, that's what Judge Walter said. There's a fact dispute on whether Persino could see that his hands were empty. And his ruling was whether the video provided clarity to that. And in doing so, I believe the court, the district court, was looking at this frame by frame and looking at snapshots. And earlier this year, the Sixth Circuit had an issue, a case nearly identical to looking at those screenshots. And the Sixth Circuit reversed the district court, finding that the district court erred on relying on— Was that an interlocutory appeal? What's the case name? Because certainly on full appeal, the appellate court can say— What's the name of the case? It's Cunningham v. Shelby County, Tennessee, 994 Federal 3rd 761. And it was from April of this year. And specifically in that case, the court said— Did you file a 28J with that? I'm sorry? Did you file a Rule 28J letter with that case? I did not, Your Honor. This was something I recently— Well, that's the nature of 28J. That, if there is a case out there that seems helpful or whatever, you notify the court and file it. Counsel opposite has an opportunity just filing something else. Especially if it came out in April and we're arguing it in August. Just for future reference, if you come across a case, file the 28J and alert us to it. Then we have a chance to read it before we get here and then counsel opposite. So if you're good, we'll look it up. Yes, Your Honor. I apologize for that. No worries. No worries. But the court did say the defendant's perspective did not include leisurely stop-action viewing of the real-time situation that they encountered to rest a finding of reasonableness on a luxury they did not enjoy as unsupported by any clearly established law. What are you citing that case for? I mean, what proposition in connection with— That's to answer the question presented by Judge Costa. I believe the district court's looking to the video for clarity was an error. This is four and a half— He didn't say to be looking at it for clarity. He just said it doesn't clearly show what the city argued to be the case. But the question is about the materiality of it. It just seems you want us to review the correctness of what he said and say that that was incorrect. That seems to be where your argument is coming to me is to say what he said is wrong. We should look at that rather than whether it's material within the analysis we have to apply. Well, in his ruling, he said the video does not provide clarity as to whether Corporal Brasino could see. But the evidence we do have is that Corporal Brasino unequivocally testified multiple times he could not see his hands. Well, I looked at the video, and I looked at the video. So Judge Walter just says, you know, it's a jury issue. It's a matter about which a jury could well accept Corporal Brasino's view, your version of what the video shows or doesn't show. That's all he said. Go ahead. But the video is not the perspective of Corporal Brasino. The video is the video. It was 10 feet, wasn't it, less than 10 feet away? How far away was it? I think it was 10 or 15 feet. But it's still not the perspective. The perspective I have looking at you right now. So video evidence can never be considered unless it's a body cam exactly showing the officer's perspective. So a dash cam, it can never be considered. I mean, can't the jury look at that and then infer what Brasino saw? You can, but I think that's when you get into the law that says we're now looking at speculation. The officer unequivocally testified he could not see his hands. It's not speculation. It's an actual video. It's actually the Supreme Court has put special emphasis on video evidence in Scott v. Harris. It's sort of super evidence, if anything. But when you know that it's not the perspective of the officer, when you know the officer is 10 to 15 feet away, looking in a different direction than the angle of the camera. And the jury can look at the video, and that can be argued. And maybe you can convince the jury that because of the different angle, the video shouldn't be given that much weight. But I don't see how the video can't be used to show one way or another what Brasino saw. But you can go ahead with your argument. You're not arguing that the district court erred by even mentioning or having the video as part of his calculus, are you? No, Your Honor. I'm not. And I think I know the appellees in their briefs argued several times that it's based on the moment that the officer chose to fire. And we both submitted screenshots concerning the video. But I think the difference is the appellees are wanting you to take one of those screenshots and analyze it and look at that. And that's requiring 20-20 hindsight. Even if they want to argue that, our posture is not trying to weigh out who's wrong, who's right, any of it. It's just, as Judge Costa said, and it's the law, we're looking at the materiality. Does that get it past the hump? We're not trying to decide for the plaintiff or the city or anything. We're just trying to apply the standard. No, I understand. Even if, I'm just saying, even if they did argue all that, we're putting a wall up against that either. We're just trying to go straight down the line. Is this material? Did the district court's determination fit within the confines of what our law? Whatever happens later, we don't have a thumb on it. Do you follow me? I do, Your Honor. And again, we go back to less than four and a half seconds. That's analyzed by milliseconds. In this court's prior authority, we've got Valderas, Ontiveros, all which say in these rapidly evolving situations, it would be error to second-guess the decision of the officer. But you agree if he saw that his hands were empty, it would be excessive force, even with four seconds. In four seconds, you can see a lot in four seconds. If he saw his hands before making the decision to fire and had the time and opportunity to react, and I think that's the difference in this case, is that there was not the time and opportunity for him to exit the vehicle, see that there was not a risk, and then withdraw the decision to fire. Ms. Buckle, as I read your briefs, they seem to take issue with whether there are disputed facts. But we have to accept that there are disputed facts, correct? Yes, Your Honor. Okay. So you're not arguing about whether there are indeed disputed facts. You're just arguing about the materiality of those facts? I acknowledge the court has to accept the factual disputes found by the district court. I do believe that even accepting those disputed facts, that when analyzing this under the qualified immunity standard, that those facts are not material, that they are not sufficient to deny qualified immunity to corporal prosceno. Okay. If there are no other questions at this time, I'll save the remainder of my time for rebuttal. Okay. All right. Thank you so much. All right. Let's see who's up. Mr. Brees. Good morning, Your Honors. Good morning. I'm Kim Brees from Ridgeland, Mississippi. I have my co-counsel here, Jim Stevens and Daryl Gold from Shreveport. All three of us are— I recognize Mr. Gold even with his mask on. Seen him a few times. Seen him a few times. Yes, sir. Well, obviously, we as the plaintiffs and the appellees in this case disagree with Nikki here that the court should overturn Judge Walter's decision. Ms. Buckle. I'm sorry? Ms. Buckle. Yes, sir. I'm sorry, sir. You said Nikki. Nikki. Ms. Buckle. Yeah. I'm sorry. Here. Ms. Buckle. There's really no dispute on the law here. I mean, obviously, you judges understand the law certainly better than I do. But it's really not dispute. The dispute becomes about whether the shooting was objectively reasonable. And that's where Judge Walter at the district court found that there is a dispute as to whether you can determine from the evidence in front of him at that point whether it was objectively reasonable or not. And the question really comes down to whether Mr. Corporal Brasenio could see the hands of Mr. Poole before Corporal Brasenio shot him. And as you have referenced, we have a clear video from the dash cam. And the dash cam, if you review it, you never see a weapon. You see his hands at most points. Even Sergeant Ivey, who was from the Shreveport Police Department, who was assigned to investigate this case, reviewed the video and says in his report that he could clearly see the hands and that there was no weapon. Even the expert hired by Ms. Buckle, a former deputy sheriff from somewhere down here, I believe from Jefferson Parish, testified in his deposition that when you view the video without any of the other evidence, if you just viewed the video by itself, he would have to say in his opinion that the shooting was objectively unreasonable, that there was no rationale for shooting Mr. Poole. So that's the factual situation that we're dealing with here. Now, Ms. Buckle makes the argument, but Corporal Brasenio is from a different perspective. We have several videos. We have other videos. From Corporal Brasenio's dash cam, you see Mr. Poole and you see the shooting. But from Officer Brooks, who came in right behind Brasenio, his dash cam shows where Corporal Brasenio was when he did the shooting, and he was just immediately outside the door. So how far is the edge of the door from the dash cam? It's several feet. So the perspective, if it's a different perspective, it's a very, very narrow difference. I'll ask you the same question I asked the other side, and I understand that lawyers' instinct is always to want to argue the record and the evidence, and you're trying to convince us what the record shows. But Judge Walter reviewed the record, including the video, and found these three factual disputes, one of which is that there's a factual dispute as to whether Poole had anything in his hands or not. So don't we just have to accept those factual disputes and not decide one way or another whether those disputes exist? I think your job is to determine whether it's material or not, and I can't see how anybody could ever say that it's not material as to whether Corporal Brasenio could see that Mr. Poole was unarmed. That's certainly a material fact, because as you said, Judge Costa, if the jury believed that Brasenio could see that his hands were empty, then clearly there would be excessive force. You shoot an unarmed suspect. Your brief just jumped out at me on page 8. It says, quote, both appellants and appellees, use-of-force experts, agree that the video evidence shows that it was objectively unreasonable for Brasenio to shoot Poole, unquote. Can you elaborate on what that expert evidence was in this case? Well, the expert for the plaintiff, our expert, former superintendent of police in Chicago, who's now a consultant, viewed the video along with all the other evidence, and his opinion was that the shooting was objectively unreasonable, and you would obviously expect him probably to come up with that opinion. The defendant hired an expert, Deputy Sheriff Kerry Najolia, who on his deposition was asked, if you saw the video and you didn't have any of the other evidence, the evidence of the chase, for example, or you didn't have Corporal Brasenio's testimony, if you just saw the video by itself, what would your opinion be as to whether it was objectively reasonable? And he said, just looking at the video, it's not objectively reasonable that he was shot. That's what that refers to in the brief. Okay. The other factors. Do you have the record sites offhand for those? I'm sorry, sir? Do you have the record sites offhand for that testimony from Mr. Poole's expert? Isn't there a footnote in the . . . There may well be. I don't have the brief in front of me. I believe there's a footnote, but I don't have it right in front of me, no, sir. Thanks. The other factor that I think that has to be considered is that, as Ms. Buckle said, from the time Mr. Poole stopped his truck and opened the door until the time he was shot was four and a half seconds. And Corporal Aceno, who says, I couldn't see his hands, also said in his deposition that he, or in the investigation or the deposition, I can't remember which, that he could not remember taking his gun from his holster. He could not remember pulling the trigger, although he shot six times. He couldn't see the hands, but he could see the evil in Mr. Poole's eyes, and he had this dark, ominous feeling that came over him. All this in four and a half seconds as he was getting out of the car. He got out of the car, moved to the side, pulled his gun, and immediately started firing in four and a half seconds. And so I think that that's obviously something for trial. You bring it up and you say, you know, do you really think that he could see what was going on, or did he really look to see whether he could see his hands or not, or did he just think this was a bad guy that was going to shoot him, and he got out and he just started shooting, which many people would, it would appear to many people that it would be that way. In addition, when Corporal Aceno testified that he took a medication for ADHD, which wears off in six to eight hours and he has trouble concentrating when he doesn't have the medicine, and he had taken it six and a half hours before the shooting, and put all those factors together, and that's going to be, of course, questions for the jury. But I think that it does bring up the question of whether Corporal Aceno's testimony is credible. And when he says that the only evidence we have that he could not see the hands is his own testimony. And the video is very clear. The people that reviewed his own sergeant, his own expert, reviewed the video and says it's clear, and we don't think it's reasonably objective. And the other thing that Judge Walter brought up was the fact that Aceno has testified that he gave warnings and orders and commands to Poole before he shot him, and that Poole did not obey the command. Now, you've got to remember, it was still four and a half seconds. He says he repeatedly said, show me your hands, show me your hands, and Poole didn't show him his hands, so he shot him. Remember, it was four and a half seconds. And if you look at the video, as Judge Walter did, he said, it appears that at best the show me your hands command was a split second before the first bullet was fired. I would believe a jury could look at that video and believe that it was not a split second before, but it was simultaneous. He started firing and yelling at the same time. The other factor that Judge Walter brought up that would have to be determined by a jury is that whether, given the position of Mr. Poole at the time he was shot, was he really in a position to be a threat? Because the video clearly shows he was attempting to get back in his truck. His back was to Corporal Buccino, and it's difficult for a juror, I think, to ever determine that he was in a position where he was actually threatening Corporal Buccino. And, again, I go back to this. This all happened in four and a half seconds. That has to do with, I think, a basis of our argument is that I think Judge Walter is correct, that those issues are issues of material fact that are disputed. And so as you, as a court of review, have to look at whether it's material or not, it's difficult for us to see how you cannot find it to be material. These are certainly material facts that determine whether or not Corporal Buccino acted unreasonably and whether he's entitled to qualified immunity, which we argue that he is not. I had a little bit of difficulty hearing Ms. Buckle from over here, but I don't think she brought up the Hick Doctrine. But if she didn't, I'm not going to go into it. But we obviously believe, and it's in our brief, that it clearly does not apply to this particular case because at the time that he was shot, he had already finished his aggravated flight, which is what he pleaded guilty to. It was over and done with. He was out of the vehicle. And so it was, as the Court says, conceptually and temporally distinct from the acts to which he pleaded guilty. And so, therefore, there's no way that the Hick Doctrine is going to apply in this case. So unless the Court has any further questions, that's all we've got. Thank you, sir. All right, Ms. Buckle. Do we have the right of rebuttal for her? Four and a half seconds simply is not enough time for when you consider the totality of the circumstances of Mr. Poole leading the officers on a 15-minute chase, driving through residential yards, evading spike strips, and while it may not have been a high-speed chase, it certainly was reckless and had all of the officers on high alert. I mean, the four and a half seconds sort of cuts both ways because he had to figure out that this guy was posing a threat of using deadly force against the officer. There was some serious threat against the officer. So what in that four and a half seconds led him to believe he was in danger? He saw Mr. Poole reaching into the back of a truck. He stopped abruptly and got out of his vehicle and reached into the back of a truck, and he believed Mr. Poole was reaching for a weapon. So it does all turn on whether he was able to, if there was a furtive gesture where Poole couldn't see, or I'm sorry, where Brisseno couldn't see, or if Brisseno was able to see him pull up from the back of the truck and have empty hands. It's all based on whether Corporal Brisseno's belief that Mr. Poole was arming himself or had armed himself was believable, and he testified unequivocally he felt that he was going to be killed or he would have to fire in order to disable Mr. Poole. That was his testimony. All right, but it's objective reasonableness looking at the record. Correct. And I think when you look at the clearly established law that it was, that does satisfy the objective reasonableness standard. And when you look at the clearly established law, the employees have not been able to point to any authority I think under this set of circumstances that would give all officers knowledge that the actions in this particular case were unreasonable. When you look at Valderez, the plaintiff in that case had actually discharged, I'm sorry, disarmed himself by throwing the weapon in the vehicle, and this court said that it was immaterial as to whether the plaintiff was actually armed at the time because there was not enough time, the events transpired in a matter of seconds, leaving the defendant officer little time to realize the plaintiff no longer posed a threat. And I think that's the exact situation that you have here. Corporal Brasino saw Mr. Poole come to an abrupt stop, exit his vehicle, and reach into the back of his truck where he could not see. And just last year there was a similar case. It was Blanchard-Dagle v. Gears issued by this court. The plaintiff in that case had led officers on a short pursuit, and he abruptly came to a stop. After exiting his vehicle, he reached for something. This court again said, in light of precedent, we cannot say every reasonable officer would have known it was unconstitutional to use deadly force against someone who reached for something. And so when you're asking about the materiality of that facts, I think when you consider the totality of the circumstances in light of the precedent, you cannot say that it is beyond debate that Corporal Brasino's actions were unreasonable. I think when you are looking at it from the objective reasonableness standpoint, considering how rapidly evolving the situation was, considering Corporal Brasino's testimony that he believed Mr. Poole was reaching for a weapon, that the four and a half seconds exiting the vehicle, making the decision to shoot, that by the time he saw, or if he could, he said he did not see Mr. Poole's hands, but even by the time he would have seen that, he would not have had time to realize that Mr. Poole was no longer a threat. Action is certainly faster than reaction. And in this situation, if Mr. Poole had reached for a weapon and pulled a weapon and Officer Brasino had waited until he actually saw the weapon, it could have been too late for Officer Brasino. And that's why I think this case is so important because you can't second-guess the actions of the officer in those rapidly evolving situations that are life or death. And there is no way to know at the moment Corporal Brasino made the decision to fire that Mr. Poole was not a threat. His belief was that Mr. Poole was a threat to his life, and that belief was reasonable. And that's why we ask that the ruling of the district court be reversed and that Corporal Brasino be entitled to qualified immunity. Thank you for the time. Thank you, Ms. Bogle. Appreciate your briefing and your argument and your responses to the court's questions.